UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 24-167 |
| DENZEL LEE | SECTION M (4) |

### ORDER & REASONS

Before the Court is a motion to suppress filed by defendant Denzel Lee seeking to exclude a firearm seized from his person on May 5, 2024.[1] The government responds in opposition.[2] On March 20, 2025, the Court held a suppression hearing.[3] The government presented the testimony of New Orleans Police Department ("NOPD") Officers Levi Atkin and Ricky Koen, who were both directly involved in Lee's investigatory stop and arrest. The government also presented the body-camera footage of both testifying officers[4] and the NOPD incident report for Lee's arrest.[5] Having considered the parties' memoranda, the evidence, the record, and the applicable law, the Court denies the motion.

I.  **BACKGROUND**

On May 5, 2024, NOPD officers working a Cinco de Mayo block party in the French Quarter conducted an investigatory stop of Lee and uncovered a concealed firearm, resulting in his arrest.[6] Several uniformed NOPD officers, including Atkin and Koen and an Officer Junious Grady, were stationed at the corner of Decatur and Bienville streets. Atkin and Koen testified that

---

[1] R. Doc. 28.
[2] R. Doc. 37.
[3] R. Doc. 38.
[4] Government Exhibits 1 (Atkin); 3 (Koen).
[5] Government Exhibit 2.
[6] As of the date of Lee's arrest, Louisiana law prohibited possession of a concealed firearm without a permit. La. R.S. 14:95(A)(1), *amended by* 2024 La. Sess. Law Serv. Act 6 (S.B. 152) (effective July 4, 2024).

they were assigned to this particular area of the French Quarter due to its high crime rates, including drug activity and reports of firearms. The interaction began when Atkin first observed a man wearing a fitted white shirt, jeans, and a black hat talking on his cellphone on Decatur Street – later identified to be Lee – from approximately 20 feet away. Atkin noticed what he described as "a large bulge in [Lee's] front center waistband that was making an acute point," which he believed could be a firearm, and shared this observation with Koen. The officers observed Lee for "less than five minutes" from this distance. Koen then asked Atkin if he wanted to "make contact" with Lee, and Atkin responded in the affirmative. The officers turned on their body cameras and informed Grady of their plan to make contact with Lee.[7]

The footage shows Lee standing on Decatur Street and talking on his cellphone, which he held in his right hand, before stepping out of the street onto the sidewalk and walking through the crowd toward Bienville Street. Atkin and Koen continued to watch Lee as he walked past them down Decatur Street. Koen testified that, as Lee was walking past them on the sidewalk, Koen observed the bulge moving "front and back" under Lee's shirt, which in Koen's experience was consistent with the way an unholstered firearm "moves with the body and the leg." The officers followed Lee, who had turned right onto Bienville Street, where he eventually stopped and joined a group on the sidewalk. Atkin approached Lee from the front, Grady from behind, and Koen from Lee's left side. Lee's cellphone was still in his right hand. Koen testified that, upon again visually confirming his belief that Lee was concealing a firearm in his front waistband, Koen nodded to Atkin to indicate that they should initiate an investigatory stop. Upon noticing Atkin,

---

[7] Atkin testified that the cameras were in "standby mode," meaning that, once turned on, one minute of footage preceding the officer's activation of the camera can be retrieved. Atkin testified that his initial observation of Lee and the beginning of his discussion with Koen were not captured. Koen can be heard asking Atkin "… you wanna make contact?" at approximately 00:05 of Atkin's camera footage (Government Exhibit 1). Atkin then shrugged his shoulders, which Koen testified was Atkin's way of making an affirmative response.

2

Lee began to back up, stepping back into Grady, who was approximately six inches behind him. Grady grabbed Lee from behind, wrapping his right arm around Lee's chest and grabbing Lee's left arm with his left hand. Lee's right hand was raised above his head, still holding his cellphone, and his left arm was at chest height. The camera footage becomes obscured in the ensuing struggle between Lee and the officers. Atkin and Koen testified that they saw Lee bring his hand down toward his waistband. Atkin testified that he thought Lee was "attempting to pull the firearm out of his waistband and probably use it" and Koen testified that he perceived the movement as a sign that Lee was "about to run." Atkin took the handgun from Lee's waistband, removing the magazine and a round from it, as other officers handcuffed Lee.

On July 19, 2024, Lee was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), having previously been convicted of two federal felony offenses and two state felony offenses.[8]

## II. PENDING MOTION

In his motion to dismiss, Lee argues that the officers seized him "upon approaching him by use of physical force (by grabbing him from behind) and a show of authority (by surrounding him)" without justification, because they had no reasonable suspicion "*before* they approached Lee and physically seized him."[9] Lee contends that, "as can be seen in the video, the alleged outline of a firearm is not visible," and so "there was no reasonable suspicion" to detain him on that basis and the firearm that was seized should be suppressed.[10] Lee also argues that the footage from the officers' body cameras, "show[ing] that it was *after* the officer grabbed Lee that Lee appeared to fumble with his waistband,"[11] contradicts the narrative description of the events

---

[8] R. Doc. 1 at 1-2.
[9] R. Doc. 28-1 at 3 (emphasis in original).
[10] *Id.* at 1.
[11] *Id.* at 5 (emphasis in original).

leading to his arrest in the police report, which states that "when [Lee] observed Officer Atkin, he attempted to back away while *simultaneously* grabbing the object in his front waistband."[12] Because, says Lee, he was not observed engaging in illegal activity and because the video footage shows that there was no visible outline of a firearm, and that he did not reach toward his waistband until after he was seized, the officers had no reasonable suspicion to believe he possessed a concealed weapon or was otherwise engaged in illegal activity when they initiated the investigatory detention and seizure.[13] Lee argues that "the video should be given greater weight than the narratives written after the fact and by memory, which is less reliable."[14] Finally, because, according to Lee, the initial investigatory detention was not supported by reasonable suspicion, he argues that the Court need not evaluate whether the subsequent pat down was warranted.[15]

In its opposition, the government argues that the officers' detention of Lee was justified because they had reasonable suspicion that Lee was carrying a concealed weapon. The government contends that Atkin had the opportunity to observe Lee, whose "clothing was not particularly loose or baggy" under well-lit and clear conditions, "further facilitating the officers' view," before the cameras were activated.[16] The government further argues that "Atkin was an experienced NOPD officer with years of experience on the streets of New Orleans," and the confirmation of his observation "by a second experienced officer, Officer Koen[,] … was enough to warrant further investigation, particularly when the officers were charged with protecting a crowd of partiers in a location that the officers knew to be a high crime area."[17] The government asserts that the officers' observations of a bulge consistent with a firearm gave rise to reasonable

---

[12] Government Exhibit 2 at 4 (emphasis added).
[13] R. Doc. 28-1 at 5.
[14] *Id.*
[15] *Id.* at 5-6.
[16] R. Doc. 37 at 5.
[17] *Id.*

4

suspicion justifying a limited protective search, even if they were not 100% certain that it was a firearm.[18] The government also contends that, as the officers approached Lee to conduct their investigatory stop, Lee's reaction "potentially create[ed] an unsafe situation," further justifying his restraint and a protective pat down.[19] The government then argues that "[u]pon frisking Lee, it was immediately apparent that the object concealed in his pants was a gun" and "[o]nce the gun was found," the officers were further justified in seizing it and arresting Lee.[20] Lastly, the government argues that the good-faith exception to the exclusionary rule applies because, even if mistaken that their actions were lawful, the officers were acting in good faith.[21]

### III.  LAW & ANALYSIS

#### A. Legal Standard

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). "Warrantless searches and seizures," such as the one here, "are *per se* unreasonable subject to certain narrow exceptions." *Id.* When a warrantless search or seizure is at issue, "[t]he government bears the burden of showing an exception applies." *Id.*

Officers are permitted to make warrantless investigatory stops "based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony." *Id.* (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 27-31 (1968)). "In an analytical

---

[18] *Id.* at 6-7.
[19] *Id.* at 7.
[20] *Id.* at 9.
[21] *Id.* at 10.

5

framework inspired by principles discussed in *Terry v. Ohio*, [courts] review the legality of police investigatory stops in a two-part test." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (footnote omitted). That test requires courts to "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (footnote omitted). In conducting a reasonable suspicion analysis, courts "'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.*

When weighing the totality of the circumstances, "a court may not consider the relevant factors in isolation from each other." *Id.* (citing *Arvizu*, 534 U.S. at 274); *see also United States v. Jacquinot*, 258 F.3d 423, 427-28 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total." (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000))). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *Alvarez*, 40 F.4th at 346. Thus, "[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Jacquinot*, 258 F.3d at 427-28 (citing *Zapata-Ibarra*, 212 F.3d at 881).

"The facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation, but can also arise from the 'collective knowledge' of law enforcement entities, so long as that knowledge gives rise to reasonable suspicion and was communicated between those entities at the time of the stop." *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014). As the Fifth Circuit has explained, "[t]he collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

B. Analysis

**1. The Officers Had Reasonable Suspicion to Stop Lee**

Lee argues that "the alleged outline of a firearm is not visible" in the body-camera footage, and "[w]ithout such view of the outline of a firearm, there was no reasonable suspicion" that he was concealing a weapon.[22] The Fifth Circuit has explained that "video recordings are given a presumption of reliability and significant evidentiary weight because an electronic recording will many times produce a more reliable rendition than will the unaided memory of a police agent. Accordingly, where testimony conflicts with video evidence, our court must view the facts in the light depicted by the videotape." *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (internal citation, quotations, and alteration omitted). However, that to the untrained eye, there is no clearly visible bulge or outline in the shape of a firearm near Lee's waistband in one of two separate body-camera footages, does not contradict the officers' testimony as to what they saw,

---

[22] R. Doc. 28-1 at 1.

nor what can be seen in the second body-camera footage.[23]  Moreover, the officers here repeatedly testified that, due to the angle and position of the body cameras and the quality of the footage, the cameras do not capture the same details that the officers wearing them can see with their eyes.

Courts have recognized this limitation of video evidence and found in similar cases that the absence of a visible bulge in video footage does not contradict officers' testimony that they saw one. *See United States v. Rowson*, 652 F. Supp. 3d 436, 444 (S.D.N.Y. 2023) ("Although the body camera footage did not make such a bulge evident to the Court, given the officers' distance from the pants and the limitations of the body-camera medium, the footage was not inconsistent with [the officer]'s observation.  And both officers credibly testified that body camera footage sometimes does not pick up nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers."); *United States v. Cole*, 459 F. Supp. 3d 116, 119 (D.D.C. 2020) ("While the Government 'acknowledged that the alleged bulge in [the defendant's] pants is not visible in the footage,' it proffered that this 'was due to the angles of the camera lens and the movements of the officers and [the defendant].'  And [the magistrate judge] found that the camera footage 'does reflect reactions and statements of the officers that were consistent with their observation and recovery of a firearm on [the defendant's] person.'" (internal citation omitted)); *see also United States v. Stuckey*, 2025 WL 34816, at *2 (N.D. Iowa Jan. 6, 2025) ("[T]he body camera is positioned on [the officer]'s torso, and thus does not capture what [the officer] could see from an eye-level angle.  Moreover, a camera lens such as that of the body camera does not refract light and discern depth in the same manner the human eye does."); *United States v. Gray*, 2021 WL 2209462, at *2 (D.D.C. May 31, 2021) ("Because the body-worn cameras focus only straight

---

[23] With his motion to suppress, Lee attached only Atkin's body-camera footage, not Koen's, but both were introduced into evidence at the suppression hearing.

ahead and are lower than the officers' sight-line, the camera does not capture everything that each officer sees."); *United States v. Osuna*, 2022 WL 17975988, at *6 n.1 (D. Idaho Dec. 28, 2022) ("[T]he Court notes that body cam footage is not the same as live observations.").

In this case, the video confirms that the conditions under which the officers observed Lee were adequate for them to observe any bulge created by a concealed weapon on his person. Lee was wearing close-fitting clothes, it was still light out, and the weather was clear. The officers testified that they observed Lee, unobstructed, from approximately 20 feet away for several minutes before they decided to approach him, which is when they turned on their body cameras. *See, e.g., United States v. Gatnoor*, 2024 WL 4524480, at *6 (D.S.D. Oct. 18, 2024) ("Although the body camera footage does not capture the bulge in [the defendant]'s waistband, the footage demonstrates [that the officer] was facing [the defendant] when he exited the [car] and would have had an opportunity to see a bulge in [the defendant]'s waistband. Moreover, the footage demonstrates that there was adequate lighting in the parking lot and that there was a sufficient amount of time for [the officer] to observe the bulge."); *cf. United States v. Hill*, 752 F.3d 1029, 1034 (5th Cir. 2014) ("Nor is this a case where the police came across a person, had a hunch that something could be amiss, and then observed the suspect for sufficient time to determine that criminal activity indeed reasonably appeared to be afoot. Only seconds elapsed from the first moment the officers saw [the defendant] in his car and when [they] ordered him to exit the car to be frisked.").

In addition to having the benefit of perceiving Lee in real time with their own eyes, the officers also relied on their specialized training and years of experience in identifying concealed weapons. Atkin has been with the NOPD for seven years, and Koen six. Atkin testified that his cases are "primarily targeted on drugs and guns, specifically around Bourbon Street," and that he

9

had recovered "anywhere from 75 to 100" concealed weapons prior to Lee's arrest.[24]  Koen also testified that he focused on firearms and narcotics cases and that he had recovered approximately 500 concealed weapons before Lee's arrest, the majority of which were recovered in the French Quarter.  Koen further testified that approximately 20% of those recoveries were subject to a motion to suppress, none of which was successful.  Accordingly, both officers had extensive experience identifying concealed firearms in the French Quarter and are permitted to "'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Roper*, 63 F.4th 473, 478 (5th Cir. 2023) (quoting *Arvizu*, 534 U.S. at 273).

Moreover, the video evidence was not limited to footage from a single body camera, but included a second one.  Even to the untrained eye, it is evident in the footage from Koen's body camera that, at several points in time, there was a bulge in Lee's waistband under his shirt, as well as shadowing on the shirt which indicated the outline of an object, that could have been a firearm.  To the trained eye, like that of the NOPD officers, this bulge and shadow were indicative of a handgun, especially given that the officers also testified that the object was not likely a cellphone since Lee was holding a phone in his right hand.  Thus, Koen's body-camera footage corroborates the testimony of the officers, even if the footage from Atkin's body camera (*i.e.*, the footage upon which Lee relies) is less convincing.  *See United States v. Brown*, 2025 WL 502082, at *1 (5th Cir. Feb. 14, 2025) (rejecting the defendant's argument "that the responding officer's testimony is contradicted by video evidence" upon holding that "a reasonable view of the evidence" reflects that "the video does not conflict with the testimony" and, instead, supports the district court's finding of reasonable suspicion and denial of the motion to suppress).

---

[24] Atkin was unaware of how many of these seizures had been successfully suppressed.

Because the Court does not find that the body-camera footage conflicts with the officers' testimony, it now must determine whether, under the totality of the circumstances, the officers had reasonable suspicion that Lee was carrying a concealed firearm. Both officers testified that they were stationed at the particular intersection where they spotted Lee for the block party because it was a "high-crime area" experiencing a recent increase in reports of firearms. Atkin testified that they were specifically "tasked with trying to combat people bringing in firearms to the event." While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), "[t]he fact that law enforcement officers know a particular area to be high in crime is indeed a 'relevant contextual consideration.'" *Hill*, 752 F.3d at 1035 (quoting *Wardlow*, 528 U.S. at 124); *see also United States v. Hill*, 2025 WL 562762, at *7 (E.D. La. Feb. 20, 2025) (noting that officer's testimony that "he was on foot patrol in the French Quarter, tasked with looking for drug and gun violations in the area [and] that the area in which he was assigned was a high-crime area, especially for gun crimes" was relevant in finding reasonable suspicion where officers also testified that they saw the outline of a firearm under the defendant's clothing); *United States v. Conner*, 2024 WL 343143, at *9 (E.D. La. Jan. 30, 2024); *United States v. Scott*, 733 F. Supp. 3d 535, 544 (E.D. La. 2024).

While the presence of a suspect in a high-crime area is insufficient on its own to establish reasonable suspicion, both officers were able to articulate other "particularized and objective bas[e]s," *Arvizu*, 534 U.S. at 273, supporting their suspicion that Lee was concealing a firearm before they stopped him, and the body-camera footage is consistent with their articulated bases. The officers described with specificity the characteristics of the bulge and explained how those characteristics informed their suspicion that it was a firearm. Atkin testified that he noticed a

11

"large bulge that had a sharp point" near Lee's "front-center waistband," which he was 90-95% sure was a firearm. This is a factor giving rise to reasonable suspicion. *See United States v. Wilson*, 2023 WL 3601590, at *5 (E.D. La. May 23, 2023) ("[T]he officers had reasonable suspicion to stop [the defendant] when they observed what appeared to be a concealed weapon on his person."); *Conner*, 2024 WL 343143, at *7 (finding reasonable suspicion based on officer's "assessment that the object in [the defendant]'s pocket was a firearm because of the bulge's L-shape"). Atkin shared his observation with Koen and told Koen that he suspected the bulge was a concealed firearm. Both officers continued to observe Lee. Koen testified that, at this point, he was 60% sure by his own observation that the bulge was a concealed firearm but wanted to get a closer look. The beginning of the body-camera footage captures Koen asking Atkin if he wants to make contact with Lee.

The footage then shows that the officers watched Lee as he started to walk down Decatur Street. Both officers testified that they believed Lee saw them observing him and perceived his walking out of the street and onto the sidewalk as an attempt to evade or "put distance between" himself and the officers; Atkin explained that he would expect "most people" would "take the less crowded path," but Lee walked into the crowd on the sidewalk instead of staying in the street, which the body-camera footage confirms was less crowded. The defense argues that Lee could have been walking into the crowd to locate his friends, given that he was speaking on his cellphone, but "[r]easonable suspicion does not require that there be 'no reasonable hypothesis of innocent behavior.'" *United States v. Miles*, 275 F.3d 1078, 2001 WL 1465241, at *3 (5th Cir. 2001) (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 n.5 (5th Cir. 1999)). The Fifth Circuit has explained that "'[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.'" *United*

12

*States v. Reyes-Medellin*, 756 F. App'x 461, 462 (5th Cir. 2019) (quoting *Jacquinot*, 258 F.3d at 427-28).

As Lee walked down Decatur Street past the officers, Koen observed his side profile, which his body-camera footage confirms was briefly unobstructed as Lee passed the officers, who were at that point standing about 15 feet from Lee. Koen testified that it was from this vantage point that he observed the bulge moving "front to back" under Lee's shirt, which Koen testified was consistent with the way an unholstered firearm moves "with the body and the leg." Courts have considered similar observations in finding that officers had reasonable suspicion that a defendant was concealing a weapon. *See Conner*, 2024 WL 343143, at *3 (finding reasonable suspicion where the surveillance-camera detective "testified that he noticed the right pocket of [the defendant]'s sweatpants 'flopping back and forth' [and] stated that he could see a large object that was weighted and, as he zoomed the camera in closer, he 'could obviously see the L shape, which is consistent with a firearm'" (alteration and footnote omitted)); *United States v. Murray*, 548 F. Supp. 3d 741, 747 (N.D. Ill. 2021) ("[The officer] described (and his body camera footage shows) how the object loosely swung around [the defendant]'s left leg while he ascended the stairs, tugging on his trousers. Drawing on his experience, [the officer] concluded that the object was a firearm based on its size, shape, and weight. That was a reasonable conclusion, grounded in [the officer]'s experience and 'common sense.'" (internal citation omitted)). Koen further testified that he deduced, by "process of elimination," that the object in Lee's waistband was most likely not a cellphone, given that Lee was holding his cellphone.

The officers testified that, after following Lee around the corner onto Bienville Street, they were able to see the bulge up close and confirm their suspicion that it was a concealed firearm. Koen testified that, from his vantage point at this time, about five feet to Lee's left side, he was

95% certain the bulge was a concealed firearm, and nodded to Grady to communicate that they would be "stopping this guy and checking to see if he had a firearm." In response, Grady grabbed Lee from behind. Considering the body-camera footage and the "specific and articulable facts" identified in the officers' testimony, the Court finds that, under the totality of the circumstances, the officers had reasonable suspicion that Lee was carrying a concealed weapon before Grady detained him.

Even assuming *arguendo* "that Lee was seized the moment the officers surrounded him," as Lee says "could be argued,"[25] the officers already had reasonable suspicion that he was carrying a concealed weapon by then. Before following Lee around the corner, the officers knew that they were in a high-crime area with reports of firearms; Atkin was 95% certain and Koen was at least 60% certain, based on their specialized training and years of experience, that the bulge was a concealed firearm due to its size, shape, and location; Koen had observed that that the bulge moved consistently with an unholstered firearm (which increased his confidence level); the officers had deduced that the object creating the bulge was probably not Lee's cellphone, as they had seen him holding a phone in his right hand; and they suspected that Lee was attempting to evade them by walking into the crowd. These factors, in their totality, are more than sufficient to "establish that there was '"a fair probability" that [the] crime [of carrying a concealed weapon] had occurred.'" *United States v. Nunez-Sanchez*, 478 F.3d 663, 667 (5th Cir. 2007) ("'The requisite "fair probability" is something more than a bare suspicion, but need not reach the fifty percent mark.'") (quoting *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)). *See, e.g., Hill*, 2025 WL 562762, at *7 ("[T]estimony and video footage showed that, based on his specialized training, [the officer] observed a bulge consistent with a concealed firearm, conferred with other officers

---

[25] R. Doc. 28-1 at 5.

regarding his belief, and then moved closer to definitively confirm that he saw a bulge in the shape of a firearm and magazine concealed in [the d]efendant's waistband. [The d]efendant was present in a high crime area, and his body language was consistent with an effort to conceal something from the officer's view. … Other district courts have found reasonable suspicion in similar instances. Accordingly, this Court finds that officers had reasonable suspicion to stop [the d]efendant, and his Fourth Amendment rights were not violated." (footnotes omitted)); *see also Conner*, 2024 WL 343143, at *7-10; *Wilson*, 2023 WL 3601590, at *4-5; *Scott*, 733 F. Supp. 3d at 544-46. When the officers surrounded Lee, they were able to observe the bulge from a closer distance – bringing Koen to 95% certainty – which only confirmed their reasonable suspicion that it was a concealed firearm.

### 2. The Officers Had Reasonable Suspicion to Frisk Lee

Because, in his view, the stop was not justified at its inception, Lee argues that "there is no need to address whether the subsequent pat down was supported by reasonable suspicion."[26] However, the Court finds that the stop was justified, and because the officers had reasonable suspicion that Lee was armed, they were also justified in frisking him. "Assuming the initial stop was lawful, 'in order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry.'" *United States v. Thomas*, 997 F.3d 603, 614 (5th Cir. 2021) (alteration omitted) (quoting *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010)); *see also Terry*, 392 U.S. at 24 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may "take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."). "An officer need not be

---

[26] *Id.* at 5-6.

certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (quoting *United States v. Michelletti*, 13 F.3d 838, 840-41 (5th Cir. 1994) (en banc)).  "'In assessing the reasonableness of an officer's actions, it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'" *Id.* (quoting *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir.1992) (en banc)).  "This inquiry does not depend on the 'officer's state of mind, or his stated justification for his actions.'" *Id.* (quoting *Rideau*, 969 F.2d at 1574). "Instead, the Fourth Amendment is satisfied 'as long as all the facts and circumstances, viewed objectively, support the officer's decisions.'" *Id.* (alteration omitted) (quoting *Rideau*, 969 F.2d at 1574).  "In short, '[courts] must attempt to put [them]selves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context.'" *Id.* (quoting *Rideau*, 969 F.2d at 1574).

For the same reasons the officers had reasonable suspicion that Lee was committing the crime of carrying a concealed weapon, they also had reasonable suspicion that he was armed.  However, "pursuant to Supreme Court precedent, 'the legality of the frisk does not depend on the illegality of the firearm's possession.'  Rather, 'the danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession.'" *Conner*, 2024 WL 343143, at *9 (internal citation and alteration omitted) (quoting *United States v. Robinson*, 846 F.3d 694, 701 (4th Cir. 2017)).  In addition to their reasons for suspecting that Lee was carrying a concealed weapon, the officers testified to the safety concerns presented by the circumstances under which they detained Lee, including the large

16

crowd, the "close proximity" of Lee's acquaintances, and the fact that many of the block-party attendees were likely intoxicated, which made their potential reactions less predictable. Under these circumstances and considering that the officers were both 95% certain that Lee was armed just before he was seized, frisking him for a weapon was objectively reasonable. *See id.* ("Based on … [the officer]'s observation that [the defendant] was likely armed, the safety risks to officers and bystanders, the number of suspects, and their proximity to a residence, [the officer] had reasonable suspicion to believe that [the defendant] was armed and dangerous and therefore the frisk of [the defendant] did not violate the Fourth Amendment.").

The detention and frisk quickly escalated into a struggle. The officers testified that they usually had one officer approach from the back to get control over the suspect's arms and hands, as "the hands are the ones that can cause us the most danger at that point." When Grady grabbed Lee's chest and left arm from behind, Lee initially lifted his arms. Atkin testified that he saw Lee's right arm "going right to" his waistband and explained that he thought Lee was "attempting to pull the firearm out of his waistband and probably use it."[27] This is consistent with the body-camera footage, which captures one of the officers telling Lee "don't do it" or "don't pull it" and then to "stop." And, while the body-camera footage becomes obstructed in the struggle, Lee's right arm can briefly be seen reaching down toward his waist despite Grady's continued attempt to restrain his arms. Akin testified that he tried to grab the firearm "to keep it out of [Lee's] control" and that he and Lee put their hands on the grip at the same time. Atkin also testified that he "immediately

---

[27] Atkin's report states that "when [Lee] observed Officer Atkin, he attempted to back away while *simultaneously* grabbing the object in his front waistband with his right hand in an attempt to remove it from his waistband." Government Exhibit 2 at 4 (emphasis added). Lee emphasizes the fact that "the bodycam footage shows that Lee was seized *before* he made any movement toward his waistband." R. Doc. 28-1 at 5 (emphasis in original). Upon reviewing the footage at the hearing, Atkin conceded that his use of the word "simultaneously" in the police report "probably … wasn't the correct word. But it was all happening within a span of five seconds." Because the Court finds that the officers had reasonable suspicion to detain Lee based on their observations before he was detained, that Lee reached for his waistband after being detained does not vitiate the officers' reasonable suspicion.

17

knew" the object in Lee's waistband was a firearm upon touching it. Once the firearm was discovered by the officers, they were warranted in seizing it and continuing to detain Lee and ultimately arresting him. *See id.* at *10 ("After discovering the concealed weapon, the officers had probable cause to believe that [the defendant] was committing an offense pursuant to Louisiana law by possessing a concealed weapon. If [the defendant] had possessed a permit, the permit would have provided him with an affirmative defense. The officers acted reasonably under the circumstances to ensure their safety, the safety of the suspects, and the safety of potential bystanders.").

In short, the officers had reasonable suspicion that Lee was concealing a firearm and were justified in detaining and frisking him.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion to suppress (R. Doc. 28) is DENIED.

New Orleans, Louisiana, this 3rd day of April, 2025.

                                                BARRY W. ASHE
                                                UNITED STATES DISTRICT JUDGE